EDISON *v.* GILLILAND *et al.*

(*Circuit Court, S. D. New York.* April 9, 1890.)

PRINCIPAL AND AGENT—FRAUD—PLEADING.

A bill which alleges that defendant, as plaintiff's agent for the sale of stock, found a purchaser willing to pay $750,000 for the stock and for a claim held by defendant against the corporation issuing it; that defendant's claim was worth only $75,000, but that defendant so arranged the sale that $500,000 represented the price of the stock, and $250,000 the value of defendant's claim; and that plaintiff, relying on defendant's representation that the purchaser had agreed to pay $500,000 for the stock, and $75,000 for defendant's claim, and ignorant that the price was $750,000 for both, entered into an executory agreement for the sale of his stock for $500,000, and that defendant had been paid $250,000 for his claim,—is fatally defective because it does not disclose that plaintiff ever parted with his stock, or had otherwise been a loser in consequence of defendant's alleged misconduct.

In Equity. On demurrer to bill.
*Eugene H. Lewis,* for plaintiff.
*Frederick R. Coudert* and *W. Bourke Cockran,* for defendants.

WALLACE, J. Briefly stated, the cause of action set forth in the bill of complaint is that the plaintiff, being the owner of certain shares of stock in a corporation, authorized the defendant Gilliland to find a purchaser, and negotiate a sale of the stock; that Gilliland got the defendant Tomlinson to assist him in negotiating the sale for a share of the profits; that Gilliland had a claim of his own against the corporation, growing out of an agency contract, of the value of about $75,000; that Gilliland and Tomlinson found a purchaser in the person of one Lippincott, who was willing to buy the plaintiff's stock; that they represented to the plaintiff that Lippincott was willing to pay $500,000 for the stock and $75,000 for Gilliland's claim against the corporation; that thereupon plaintiff entered into an executory written contract with Lippincott for the sale of the stock at the price of $500,000, to be paid, at a future day, upon the delivery by plaintiff of the shares to Lippincott; that, in fact, Gilliland and Tomlinson had negotiated with Lippincott for a purchase by which he was to give $750,000 for the stock and Gilli-

land's claim, they both knowing that the claim was only of the value
of $75,000, and he being indifferent as to how the $750,000 should·
be apportioned between the price of the stock and the claim of Gilli-
land; that the defendants and Lippincott thereupon fixed the terms of
the purchase so that $500,000 should represent the price of the stock,
and $250,000 should represent the value of Gilliland's claim; that the
plaintiff, relying upon the representations of the·defendants that Lip-
pincott was to pay $500,000 for the stock and $75,000 for Gilliland's
claim, and ignorant that Lippincott was to pay $750,000 for both, en-
tered into the executory contract mentioned for the sale of his stock to
Lippincott; and that thereafter Lippincott paid to the defendants, and
they received from him for themselves, the $250,000. The theory of
the bill of complaint is that by their fraudulent conduct the defendants
"merged the actual value of Gilliland's claim in the value of the plain-
tiff's stock, and thereby forfeited all claim to receive or have allowed to
them in any way " its actual value, and are therefore liable to account
for the whole sum of $250,000.

Although there is nothing alleged in the bill directly, or from which
it can be inferred, to show that Lippincott did not regard the Gilli-
land claim as of the value of $250,000, or that he would have been
willing to give $500,000, or any less sum, for the plaintiff's stock with-
out also acquiring Gilliland's claim, it would not follow that the plain-
tiff could not recover if he really lost anything by the alleged miscon-
duct of his agents. If, availing themselves of their opportunity as
fiduciaries, they sold property of their own, or belonging to Gilliland, for
more than three times its value, because they were able to control the
sale of the plaintiff's property, without informing plaintiff of the facts,
they were guilty of disloyalty to him; and, upon the discovery of their
misconduct, he could, as to them, repudiate their authority to sell his
property, or, at his election, compel them to account for the profits il-
licitly acquired by the transaction.

The bill is, however, fatally defective ˌbecause the facts set forth do
not disclose that the plaintiff has parted with his stock, or otherwise
been a loser, in consequence of the alleged misconduct of the defendants.
He has entered into an agreement to sell and deliver his stock, at a
future day, upon receiving the purchase money; but that day had long
expired before the bill was filed, and it does not appear that the con-
tract was ever consummated. For all that appears, he has the stock now,
is still its owner, and nothing ever came from the contract. Whether
Lippincott repudiated it, or whether the plaintiff did, or whether it was
carried out, is left wholly to conjecture. It must be assumed, upon de-
murrer, that the pleader has stated his case as favorably as the facts will
permit. It must be inferred, therefore, that the contract, for some
unexplained reason, has fallen through, and that the plaintiff ·is in the·
same position he was before it was made. The case as stated by the bill
is, at best, one in which a principal has employed agents to sell property
for him, and·they have taken advantage of their agency to sell their own
property at a price largely in excess of its real value. The case is not

one where the principal has lost the sale of his own property by the misconduct of his agents. But the theory of the bill is that the property was actually sold, while the facts show that the sale has never been completed, and, consequently, that the plaintiff has lost nothing by the transaction. The demurrer is sustained.